IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRENDA D. MOXLEY, | ) | CASE NO. 1:15CV1533 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Brenda Moxley ("Moxley") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the Administrative Law Judge ("ALJ") failed to consider Moxley's obesity and did not explain her credibility assessment sufficiently.  As a result, the undersigned cannot conduct a meaningful review of the Commissioner's decision and is unable to conclude that the Commissioner's decision is supported by substantial evidence.  Accordingly, the undersigned recommends that the Commissioner's decision be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

**I. Procedural History**

1

On January 4, 2012, and May 17, 2012, Moxley filed applications for DIB and SSI, respectively, alleging a disability onset date of July 21, 2010.  Tr. 23, 122, 123.  She alleged disability based on the following: severe back pain, vaginal fistula, unable to walk more than 40 feet without resting, and unable to sit and stand for long periods.  Tr. 247.  After denials by the state agency initially (Tr. 122, 123) and on reconsideration (Tr. 142, 143), Moxley requested an administrative hearing.  Tr. 114, 116.  A hearing was held before Administrative Law Judge ("ALJ") Tammy Georgian on January 30, 2015.  Tr. 46-113.  In her February 17, 2015, decision (Tr. 23-38), the ALJ determined that Moxley can perform her past relevant work, i.e., she is not disabled.  Tr. 36.  Moxley requested review of the ALJ's decision by the Appeals Council (Tr. 19) and, on June 11, 2015, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Moxley was born in 1953 and was 58 years old on the dates her applications were filed. Tr. 234.  She previously worked as an office manager, appointment clerk, security guard, data entry clerk, order clerk, and customer service representative.  Tr. 54-59.  She has a high school education and obtained a certificate as a medical assistant.  Tr. 53-54.

### B.  Medical Evidence

In 2010, Moxley was living in Maryland.  Tr. 54, 305.  On July 27, 2010, she saw Debra Curtis, M.D., complaining of an infected bug bite.  Tr. 305-306.  She also reported bilateral hip pain due to osteoarthritis.  Tr. 305.  She described pain when she walked.  Tr. 305.

A treatment note signed on December 5, 2011, reflected Moxley's complaints of right leg

numbness for over a year and right lower quadrant pain.  Tr. 398.  It listed her history of vaginal

fistula since 2002 and her five related surgeries.  Tr.  398.  Moxley reported that she did not

exercise regularly due to leg pain.  Tr. 399.  She complained of decreased energy, muscle pain in

both legs and the right side of her lower back, and bilateral "'burning' foot pain."  Tr. 399.  She

was 5 feet 6 inches tall, weighed 211 pounds, and had a Body Mass Index ("BMI") of 34.05.  Tr.

400.  Upon examination, her gait was intact and she used a cane.  Tr. 401.  She was tender

around her lumbar and sacroiliac spine and had a positive straight leg raise on her right leg.  Tr.

401.  Her deep tendon reflexes were slightly diminished at her patella bilaterally and achilles

bilaterally.  Tr. 401.

On December 12, 2011, an x-ray of Moxley's lumbar spine revealed no degenerative disc

disease; intact pedicles, transverse and spinous processes; and no pars defect.  Tr. 375.  She had

facet degeneration on her right side at L3-4 and L4-5 and atherosclerotic peripheral vascular

disease.  Tr. 375.  An x-ray of her sacrum and coccyx showed degenerative/stress-related

changes about her symphysis pubis, more pronounced on the right side than left, and was

otherwise unremarkable.  Tr. 376.  The x-rays were taken as a result of Moxley complaints of

lower extremity numbness and difficulty walking long distances.  Tr. 376.

On December 14, 2011, Moxley went to a physical therapy evaluation to be evaluated

and treated for sciatica and right lower extremity pain.  Tr. 369.  She reported sciatica for a year

and current pain and numbness from her hip, down her thigh, and to her knee.  Tr. 369.  Her pain

increased with walking and prolonged standing and decreased with flexion.  Tr. 369.  She

reported her pain level experienced while walking into the building from the parking lot as 7/10.

Tr. 369.  Her goal was "to get better so she can work and walk without pain."  Tr. 369.  Upon

examination, her trunk flexion was within normal limits, trunk extension was "50% of normal

with increased pain over the right L5-S1 area," and side bending and rotational bending were within normal limits.  Tr. 369.  Muscle testing was deferred due to pain.  Tr. 369.  She had numbness from her right buttocks down her thigh to her knee.  Tr. 370.  Her gait was antalgic and she walked without a cane.  Tr. 370.

After thirteen physical therapy sessions, from December 14, 2011, to February 7, 2012, Moxley reported intense bilateral lateral hip pain and burning, rated 7/10, after walking for more than five minutes.  Tr. 435.  Her symptoms were decreased by repeated flexion while sitting and standing "and prolonged sitting dissipates the pain altogether."  Tr. 435.  The therapist stated that stenosis was a possibility.  Tr. 435.  Moxley was performing more than 30 minutes of exercise in therapy and her pain decreased with exercise.  Tr. 435.  The therapist recommended further diagnostic testing because they had not been able to consistently decrease her pain.  Tr. 435.  A lumbar MRI taken on February 16, 2012, showed multilevel disc bulging and facet hypertrophy extending from L3-4 through L5-S1 and bilateral recess stenosis at L4-5.  Tr. 365.

On March 2, 2012, Moxley complained of low back pain radiating down her leg.  Tr. 394.  She weighed 214 pounds (BMI 34.54), her lumbar spine was tender, and she had a positive right side straight leg raise.  Tr. 394.  She was on the waiting list to follow up with a neurologist.  Tr. 394.  She received lumbar epidural steroid injections on April 20, 2012, May 11, 2012, and May 31, 2012.  Tr. 340-342, 334-336, 328-330.

On April 2, 2012, Moxley saw C. Piccirelli, M.D., complaining of pain radiating down her right side into her foot and in both thighs.  Tr. 391.  She had numbness in her thighs when she stood, sat, and walked.  Tr. 391.  She could walk 30 steps then had to stop.  Tr. 391.  Upon examination, Dr. Piccirelli observed normal motor strength in both legs and negative straight-leg-raising test results bilaterally.  Tr. 391.  Moxley's deep tendon reflexes at her knees were

normal but unresponsive at her ankles.  Tr. 391.  Her gait was "brisk" and her ability to heel and toe walk was "intact."  Tr. 391.  Dr. Piccirelli diagnosed low back pain and right radiculopathy. Tr. 391.

On May 25, 2012, Moxley complained of left side throat pain.  Tr. 390.  She was diagnosed with obesity and smoking.  Tr. 390.  On July 2, 2012, she saw Dr. Piccirelli and reported ongoing numbness and pain at her flank down her leg, burning in her feet, and soreness in the back of her leg.  Tr. 389.  She was frustrated, complained of worsening symptoms, and not being able to walk due to pain.  Tr. 389.  She took Vocodin when she needed to walk and it provided short relief.  Tr. 389.  Upon examination, she had a mildly tender back and hips, was obese, had full leg strength, negative straight leg raises, unresponsive ankle reflexes, and a mildly antalgic gait on her right side, though she could heel/toe walk.  Tr. 389.  Dr. Piccirelli assessed right side radicular pain, with bilateral L4-5 lateral recess stenosis, and referred her for a surgical evaluation.  Tr. 389.

On February 6, 2013, Moxley saw Robert Molle, CNP, as a new patient for a check-up, paperwork, and medication refills.  Tr. 449.  She still had back pain, numbness in her right hip, trouble standing or walking more than 40 feet, and burning under both feet.  Tr. 449.   At a follow-up visit on February 27, 2013, Moxley complained of elbow pain in the mornings that resolved after a short period of activity.  Tr. 452.

On May 2, 2013, Moxley saw neurologist Zhamoing Chen, M.D.  Tr. 461-463.  Dr. Chen summarized Moxley's complaints: constant cramping sharp pain in her lower back radiating to her right leg, made worse by walking and relieved by sitting; and tingling, numbness and weakness in her right lower leg.  Tr. 461.  Upon examination, Moxley's mental findings were normal.  Tr. 462.  Her physical findings included normal muscle strength and tone, normal

reflexes in her upper extremities, absent reflexes in her lower extremities, positive straight leg
raises bilaterally, stocking-glove pattern sensory loss and diminished vibration sensation
bilaterally, and mild difficulty tandem/toe/heel walking.  Tr. 462.  Dr. Chen diagnosed bilateral
lumbosacral radiculopathy, polyneuropathy, and obstructive sleep apnea.  Tr. 462.  He
recommended Moxley obtain an EMG, which she subsequently did, and which showed bilateral
lumbosacral polyradiculopathy.  Tr. 463, 464.

On June 10, 2013, Moxley saw Dr. Chen again complaining of arm pain with numbness
and tingling and neck pain that radiated from her neck to bilateral upper extremities.  Tr. 625-
626.  Her gait was slow and she used a cane.  Tr. 625.  Dr. Chen assessed bilateral cervical
radiculopathy and bilateral lumbar radiculopathy, increased her gabapentin prescription, and
ordered MRI and EMG tests.  Tr. 626.  The cervical MRI, taken on June 21, 2013, revealed
multilevel mild degenerative disc disease in her cervical spine, including borderline central canal
stenosis at C3-C4 with mild ventral remodeling of her cord.  Tr. 793.  The EMG, taken on June
24, 2013, revealed right ulnar mononeuropathy due to compression across her right elbow but no
electronic evidence of bilateral cervical radiculopathy.  Tr. 495.  On June 24, 2013, Dr. Chen
assessed Moxley with right ulnar neuropathy and bilateral lumbar radiculopathy.  Tr. 623-624.

On August 14, 2013, Moxley filled out a follow-up visit information sheet in which she
listed the following complaints: lower back pain, right leg numbness, burning under both feet
when walking, bilateral knee pain, and an inability to move her arms without pain.  Tr. 616.  She
wrote that her medications were not helping her.  Tr. 616.  She also indicated weight gain,
depression, sensation loss, joint pain or swelling, and daytime sleepiness.  Tr. 617.  She
complained of whole body pain which prevented exercise.  Tr. 620.  Upon examination, Dr.
Chen noted weakness and a slow gait.  Tr. 619-620.

On September 17, 2013, Moxley called Dr. Chen's office upset, crying, complaining of worsening leg pain, and that an increase in her gabapentin was not helping.  Tr. 621.  On September 21, 2013, Moxley saw a physician who noted her history of peripheral neuropathy and found her, upon examination, to have full muscle strength throughout but unable to rise from a seated position without using her arms.  Tr. 476.  The physician recommended further testing, physical therapy, and a follow-up with a neurologist.  Tr. 477.

On September 11, 2013, a lumbar spine MRI showed "no significant disc degenerative changes or spinal canal stenosis or neural foraminal narrowing."  Tr. 792.  In October 2013, Moxley reported ongoing back pain radiating to her legs, a burning sensation when walking, and that her pain was causing depression and limiting her daily activities.  Tr. 663, 475.  Upon examination, she had 5/5 strength in her lower extremities and decreased sensation in her right lower extremity.  Tr. 663.  She had elevated CPK levels and further testing was recommended.  Tr. 475, 663-664.

On October 17, 2013, Moxley complained to Dr. Chen that she had pain all over her body and "felt 'she is falling apart.'"  Tr. 615.  Her medications were not helping relieve her pain.  Tr. 615.  She weighed 203 pounds (BMI 32.8) and walked slowly with a cane.  Tr. 614.  Dr. Chen assessed bilateral lumbosacral polyradiculopathy and right ulnar neuropathy.  Tr. 615.  Upon examination on October 21, 2013, Dr. Chen observed stocking/glove sensory loss and slowed or delayed reflexes (areflexia) at Moxley's bilateral lower extremities, positive straight leg raises, and elevated CPK levels.  Tr. 480.  A nerve conduction study was performed to rule out myopathy/neuropathy.  Tr. 480.  The exam result was abnormal and showed "[l]eft lumbar radiculopathy due to normal nerve conduction, acute or ongoing or chronic denervation changes

from multiple lower limb and back muscles." Tr. 480.  No electronic evidence of myopathy was detected and a muscle biopsy was recommended "if clinically indicated." Tr. 480.

On December 13, 2013, Moxley saw Usha Vemulakonda, M.D.  Moxley reported problems with transportation that affected her ability to keep her medical appointments.  Tr. 586. Dr. Vemulakonda observed that nerve conduction studies showed no major neuropathy.  Tr. 586. Upon examination, she described Moxley as obese.  Tr. 587.  She had a reduced range of motion due to pain.  Tr. 587.

On February 5, 2014, Moxley complained of worsening bilateral lower extremity pain shooting down from her hip that was not relieved by taking Neurontin.  Tr. 505.  She also reported difficulty with stairs and rising from a chair.  Tr. 505.  She weighed 205 pounds.  Tr. 505.  On February 11, 2014, Moxley saw Dr. Vemulakonda to be cleared for a muscle biopsy. Tr. 582-583.  Moxley endorsed pain in her thighs, back and legs, fatigue, weight gain, and numbness and tingling in her thighs and legs.  Tr. 582-583.  She was taking Vicodin as needed and her Neurontin was "not fully helpful." Tr. 582.  Dr. Vemulakonda provided a prescription for mobility services, stating that Moxley had difficulty using fixed route transportation due to muscle weakness from chronic musculoskeletal disease, possible polymyositis.[1]  Tr. 795.

Results of a muscle biopsy performed on March 21, 2014, showed "an inflammatory myopathy with primary endomysial inflammation and myofiber degeneration, necrosis,

---

[1]  Polymyositis is described as:

> an uncommon inflammatory disease that causes muscle weakness affecting both sides of your body.  [It] can make it difficult to climb stairs, rise from a seated position, lift objects or reach overhead.  [It] most commonly affects adults in their 30s, 40s or 50s.  It is more common in blacks than in whites, and women are affected more often than men.  [] [S]igns and symptoms usually develop gradually, over weeks or months.  While there is no cure for polymyositis, treatment—ranging from medications to physical therapy—can improve [] muscle strength and function.

Tr. 595 (Mayo Clinic definition of polymyositis). Muscles affected include those closest to the trunk, i.e., hips, thighs, shoulders, upper arms, and neck.  Tr. 598 (Mayo Clinic symptoms).  Weakness associated with polymyositis tends to gradually worsen.  *Id.*

myophatgocytosis, and regeneration," consistent with a diagnosis of polymyositis or inclusion body myositis ("IBM").[2]  Tr. 797.

A treatment noted dated April 2, 2014, assessed Moxley with myositis with significant proximal weakness.  Tr. 506.  Upon examination she had proximal muscle weakness 3+/5 in her bilateral lower proximal quadriceps and 4/5 in her distal muscles.  Tr. 507.  She was advised to start prednisone.  Tr. 507.

On May 7, 2014, at a follow-up visit, Moxley reported that she did not think the prednisone was helping at all with her symptoms and that the only medication that helped was Percocet.  Tr. 650.  She had pain in her bilateral thighs, numbness in her right thigh, weakness in her hips and shoulders, and radiating pain from her lumber spine to her thigh.  Tr. 650.  Upon examination, she had proximal muscle weakness in her hip and shoulder joints, limiting her range of motion, and a limited gait due to pain.  Tr. 650.  Her prednisone dosage was increased. Tr. 650.

---

[2]  According to the National Institute of Health:

> Inclusion body myositis (IBM) is one of a group of muscle diseases known as the inflammatory myopathies, which are characterized by chronic, progressive muscle inflammation accompanied by muscle weakness.  The onset of muscle weakness in IBM is generally gradual (over months or years) and affects both proximal (close to the trunk of the body) and distal (further away from the trunk) muscles.  Muscle weakness may affect only one side of the body.  Falling and tripping are usually the first noticeable symptoms of IBM.  For some individuals, the disorder begins with weakness in the wrists and fingers that causes difficulty with pinching, buttoning, and gripping objects.  There may be weakness of the wrist and finger muscles and atrophy (thinning or loss of muscle bulk) of the forearm muscles and quadricep muscles in the legs.  Difficulty swallowing occurs in approximately half of IBM cases.  Symptoms of the disease usually begin after the age of 50, although the disease can occur earlier.  IBM occurs more frequently in men than in women.

> There is no cure for IBM, nor is there a standard course of treatment.  The disease is generally unresponsive to corticosteroids and immunosuppressive drugs.  Some evidence suggests that intravenous immunoglobulin may have a slight, but short-lasting, beneficial effect in a small number of cases.  Physical therapy may be helpful in maintaining mobility.  Other therapy is symptomatic and supportive.

National Institute of Neurological Disorders and Stroke, NINDS Inclusion Body Myositis Information Page, http://www.ninds.nih.gov/disorders/inclusion_body_myositis/inclusion_body_myositis.htm (last visited April 4, 2016).

On May 30, 2014, Moxley saw Jemima Felicity Languido Albayda, M.D., for a further evaluation of possible polymyositis at the request of Dr. Vemulakonda.  Tr. 812.  Dr. Albayda noted that Moxley's history of back pain began in 2006 and steadily progressed while she was performing an increased workload, including heavy lifting.  Tr. 812.  Moxley then experienced stabbing pain in her thighs and numbness on the outside of her thighs, later began experiencing weakness of her right leg with her knee giving way at times, and then pain in her arms but no discernible significant weakness.  Tr. 812.  Dr. Albayda commented that Moxley reported starting prednisone in mid-April; complained that it did not help her symptoms and caused side effects including weight gain, dry mouth and difficulty swallowing; was directed to increase her prednisone dose; and that Moxley abruptly stopped taking her prednisone because it still was not helping her symptoms and her side effects got worse.  Tr. 812.  She had been off prednisone for about two weeks prior to her visit and her dry mouth had improved but her difficulty swallowing, which she experienced prior to taking prednisone, had not.  Tr. 812.  She weighed 212 pounds (BMI 36.37).  Tr. 813.

Upon examination, Dr. Albayda observed that Moxley had no areas of synovitis, deformities or limitation of motion and a negative straight leg raise test.  Tr. 813.  She had normal muscle tone and no atrophy.  Tr. 813.   She had mild weakness in her right bicep, tricep, and knee, and her hip flexion was tested as an inability to raise against gravity.  Tr. 813-814.  She could not rise from a chair or a six-inch stool with her arms crossed and she walked on heels and toes with difficulty.  Tr. 814.  She limped on the right side from pain and her reflexes were decreased.  Tr. 814.  EMG results showed mild irritable myopathy, most notable in her right iliacus. Tr. 814.  An MRI of her thigh was "consistent with mild or mixed acute and chronic myopathy" predominately affecting the anterior department and "anatomy associated with

ischiofemoral impingement with edema in the quadratus femoris, bilateral." Tr. 814.[3]  Dr. Albayda concluded that Moxley had a few features that were atypical in her presentation of possible polymyositis, e.g., "She does not notice any significant weakness (especially in the arms), but rather is hampered by pain in the low back and lower extremities" and her condition did not respond to prednisone. Tr. 815. As polymyositis is a diagnosis of exclusion, Dr. Albayda indicated she would like to investigate further. Tr. 815. She discontinued prednisone, noting that IBM is not treated with an immunosuppressant, such as prednisone. Tr. 815. She recommended physical therapy "as she is able to .... This would also help with an ischiofemoral impingement syndrome which may be a contributing factor in her back and hip pain, especially since she displays no clear findings of a radiculopathy." Tr. 815. Dr. Albayda suggested a trial of Cymbalta, which she noted would also help with Moxley's complained-of depression. Tr. 815.

On July 3, 2014, Moxley saw Dr. Vermulakonda for a follow-up visit. Tr. 782. Moxley reported that she was unable to get Cymbalta because her insurance does not cover it and that oxycodone was helping with her back pain but not her leg pain as much. Tr. 782. She had yet to follow up with her rheumatologist. Tr. 782. She complained of fatigue, depression and "burning" and weighed 218 pounds (BMI 35.18). Tr. 783. Dr. Vermulakonda assessed polymyositis, chronic pain and depression, and prescribed Wellbutrin. Tr. 783.

On August 6, 2014, Moxley reported to Dr. Vemulakonda that she had gotten a walker for ambulation. Tr. 779. She complained of pain and weakness. Tr. 779. She advised that she was moving to Ohio and would be transferring her care to the Cleveland Clinic. Tr. 779.

After her move, Moxley saw neurologist John Morren, M.D., for an opinion regarding myositis on October 23, 2014. Tr. 739. She rated her lower limb pain as 7/10, on average,

---

[3]  Ischiofemoral impingement is abbreviated as IFI.

experienced predominantly as a sharp stabbing pain aggravated by walking and prolonged standing and alleviated by sitting/supination.  Tr. 739.  She reported a greater progression in lower extremity weakness than upper extremity, right extremities more than left extremities.  Tr. 739.  She rated her right extremities as 30% of her baseline strength/functionality, her left upper limb was 90% and her lower left limb was 50%.  Tr. 739.  She reported difficulty getting up from a seated position and could not do so without using her arms.  Tr. 740.  She used a cane and maintained independence in her activities of daily living but had difficulty with activities like brushing her teeth and hair.  Tr. 740.  Her fine motor tasks such as buttoning clothes were relatively unaffected.  Tr. 740.  She stated that she had gained about 75 pounds over the past year and attributed her weight gain mostly to prednisone.  Tr. 740.

Upon examination, Moxley had no appreciable atrophy, fasciculations or abnormal movements, no pronator drift or scapular winging, and she had normal muscle tone.  Tr. 742. She had 4-5/5 motor strength and diminished or trace reflexes.  Tr. 742-743.  She had slightly more pronounced finger flexors and quadriceps weakness.  Tr. 745.  Her gait was "slightly wide-based, cautious and with somewhat waddling quality."  Tr. 743.  She was unable to stand on tiptoes and heels stably and displayed a marked unsteadiness attempting to tandem gait.  Tr. 743. After reviewing Moxley's prior records, imaging, and test results, Dr. Morren suspected IBM and ordered an EMG for diagnostic confirmation.  Tr. 743-745.  Results from an EMG taken in November 2014 were consistent with IBM.  Tr. 755.

On December 3, 2014, Moxley visited Kenneth Grimm, D.O., for a pain management evaluation.  Tr. 835.  Upon examination, Moxley had some difficulty transitioning from sitting to standing, reduced deep tendon reflexes and trace patellar ankle jerk.  Tr. 837.  Dr. Grimm

assessed widespread pain, obesity, obstructive sleep apnea ("OSA"), osteoarthritis, and depression.  Tr. 837.

The same day, Moxley saw Laren Fuller, M.D., for a medication recheck visit.  Tr. 840. She complained of difficulty swallowing liquids, difficulty sleeping, and reported that her Cymbalta, which she had been taking for three weeks, was not helping her mood or her pain.  Tr. 840.  Dr. Fuller assessed inflammatory myopathy, generalized weakness, myalgia, pain in limb, dysphagia, OSA, chronic pain, depression, obesity, tobacco use, and COPD.  Tr. 842.

On December 22, 2014, Moxley saw Dr. Morren for a follow up appointment.  Tr. 726. Moxley reported that "overall her symptoms have remained unchanged" since her previous visit. Tr. 726.  She complained of "intermittent pain, which continues to occur mostly in the bilateral ankles, shoulder, and arms," averaging 3/10 on a pain scale.  Tr. 726.  She continued to have gait difficulties and had two falls since her last visit.  Tr. 726.  Examination findings were similar to her last visit. Tr. 727-728.  Dr. Morren concluded, "in my opinion, IBM is the working diagnosis going forward."  Tr. 730.  He explained, "This is a condition notoriously unresponsive to various therapeutic endeavors and by about 15 years after onset, most patients require assistance with basic daily activities, and some become wheelchair bound or bedridden."  Tr. 730.  Alternative drug treatment plans were deferred until after Moxley's scheduled appointment with her rheumatologist.  Tr. 730.

On December 29, 2014, Moxley saw rheumatologist Shailey Desai, M.D., for an opinion and advice regarding myopathy.  Tr. 759.  Moxley reported difficulty swallowing liquids and lower extremity weakness greater than upper extremity weakness causing difficulty standing, dressing, and cooking.  Tr. 759.  Upon examination, Moxley had no edema and normal pulses bilaterally.  Tr. 762.  She had a normal gait, 5/5 strength in her biceps and 4/5 strength in her

shoulder muscles, hands and lower extremity muscles bilaterally, and symmetrical patellar reflexes.  Tr. 762.  She had a full range of motion in all upper and lower extremity joints and she could fully close her fists and curl her fingers bilaterally.  Tr. 762.  After reviewing Moxley's record, Dr. Desai assessed "myositis: with proximal/distal weakness, generalized necrotizing myopathy favoring IBM per EMG, polymyositis vs IBM per muscle biopsy, and steroid unresponsiveness."  Tr. 763.  She agreed with Dr. Morren that IBM was the more likely diagnosis.  Tr. 763.  She increased Moxley's Neurontin to 600mg three times a day and recommended pain management and chronic pain rehabilitation.  Tr. 763.

On January 15, 2015, Moxley presented for a physical therapy evaluation.  Tr. 774.  She indicated that she had serious difficulty walking or climbing stairs, dressing or bathing, and difficulties running errands such as shopping or office visits.  Tr. 774.

### C.  Medical Opinion Evidence

#### 1.  Treating Source Opinion

On January 5, 2015, Dr. Morren drafted a letter stating that Moxley had a debilitating muscle disorder with a working diagnosis of IBM.  Tr. 725.  He explained that the onset of her symptoms was noted in 2006 and that he recently had documented significant deficits.  Tr. 725.  He reiterated that IBM is a condition notoriously unresponsive to various therapeutic endeavors and that about 15 years after onset, most patients require assistance with basic activities and some become wheelchair bound or bedridden.  Tr. 725.

#### 2.  Consultative Examiner

On September 27, 2012, Moxley saw orthopedic surgeon Lawrence Honick, M.D., for a consultative examination.  Tr. 439-441.  Moxley stated that she could not work because of lower back pain.  Tr. 439.  She described intermittent but daily pain in her back ranging from moderate

to severe, with pain worse in the right lumbar region and radiation into the right lower extremity with numbness, tingling, and weakness.  Tr. 439.  She explained that her symptoms began in 2006; her pain increased since then; after an MRI she was told that she had a sciatic nerve problem; and she had three back injections, none of which helped.  Tr. 439.  Moxley stated that she could sit for 15 minutes, stand for 10 minutes, and walk about 40 feet with a cane.  Tr. 439.  She avoids bending, stooping and lifting because of pain.  Tr. 439.  She had no problems with her upper extremities and could drive.  Tr. 439.

Upon examination, Dr. Honick observed that Moxley ambulated "rather slowly using a cane" and had moderate difficulty getting up and moving about.  Tr. 440.  He remarked that her stated height was 5'6 and stated weight was 201 pounds.  Tr. 440.  She had moderate tenderness and questionable spasm in her right lumbar region and limited range of motion in her cervical spine.  Tr. 440, 443.  She had a positive straight right leg raise test and no neurological defects in her lower extremities.  Tr. 440.  Reviewing Moxley's x-rays taken in December 2011, Dr. Honick opined that Moxley most likely had a herniated lumbosacral disc with radiculopathy. Tr. 440.   He thought that surgery might help but, since Moxley had no health insurance, it was not an option.  Tr. 440.  He stated, "Without treatment, I think this lady is as good and as bad as she is going to get."  Tr. 440.  He opined that Moxley could do some type of work that would allow her to sit or stand to relieve her discomfort, would not require bending, stooping, or lifting, and that she would have considerable problems with transportation to and from work.  Tr. 440.

### 3.  State Agency Reviewers

On September 28, 2012, state agency reviewing physician M. Ahn, M.D., reviewed Moxley's record.  Tr. 128-131.  Regarding Moxley's residual functional capacity ("RFC"), Dr. Ahn opined that Moxley could occasionally lift and/or carry 20 pounds, frequently lift and/or

carry 10 pounds, sit, stand and/or walk about 6 hours in an 8-hour workday, and could occasionally climb, balance, stoop, kneel, crouch and crawl.  Tr. 129.

On April 2, 2013, state agency reviewing physician Henry Scovern, M.D., reviewed Moxley's record and affirmed Dr. Ahn's opinion.  Tr. 149-151.  Dr. Scovern observed that consultative examiner Dr. Honick stated that Moxley had considerable difficulty moving about, used a cane, and would have considerable problems with the work commute, indicating that he felt Moxley's weight bearing capabilities would be restricted.  Tr. 151.  Dr. Scovern explained that other evidence in the file, some after the consultative examination, did not document significant weight bearing limitations or cane use, citing a treatment note of a visit with nurse Molle as listing Moxley's weightbearing activity capability as "unknown."  Tr. 151.  Dr. Scovern also stated that it appeared that Moxley's consultative examination presentation was not typical of her daily level of functioning.  Tr. 151.

### D. Testimonial Evidence

#### 1. Moxley's Testimony

Moxley was represented by counsel and testified at the administrative hearing.  Tr. 51-92. She lives with her god-brother and his teenage daughter in a single story home.  Tr. 52.  When asked what prevented her from working, beginning in July 2010, Moxley answered that her pain had become unbearable.  Tr. 60.  It began with a pulling in her back on her right side.  Tr. 60. She thought she pulled a muscle because she used to move a lot of furniture but the ibuprofen her doctor prescribed did not help.  Tr. 60.  Her doctor suggested physical therapy, but Moxley could not afford to pay for it and her work schedule did not permit it.  Tr. 60-61.  She kept "walking through the pain," but as time went on it got worse.  Tr. 61.  Now she can hardly walk 30 feet. Tr. 61.  Her hands are very weak and she has shooting pains down her legs and stabbing pain in

her thighs.  Tr. 61, 77.  She cannot pick up anything heavy.  Tr. 61.  When she walks, the pain radiates down her right thigh and her whole thigh is numb.  Tr. 61.  As a result, she lies in bed "practically all day" and does not do anything because the pain is constant and never goes away. Tr. 61.  Her medication will calm it down but does not take it away.  Tr. 61.  Moxley listed the medications she takes: gabapentin, oxycodone, loperamide, cyclobenzaprine, ibuprofen and Wellbutrin.  Tr. 61-62.  She takes all these medications every day.  Tr. 62.

In 2010, Moxley had to leave her job because of pain in her back and leg that would occur after standing for two or three minutes.  Tr. 79.  If there was no chair available she would lean against the wall to try to take the pressure off her right side, but she also had pain in her left side.  Tr. 79.  If she sat down the pain would release in a matter of seconds.  Tr. 80.  In 2011 she had problems walking from her door to the mailbox, a short distance.  Tr. 74-75.  Sitting became a problem starting in 2012, when she would feel a burning in the back of her legs that would require her to adjust herself after about fifteen minutes.  Tr. 79-80.  Her hands began to become a problem in early 2014.  Tr. 82.  She now has to hold her coffee cup with two hands so she does not drop it.  Tr. 82.  She cannot climb steps at all.  Tr. 83.

Moxley described her typical day.  She gets up, sits on the side of her bed, and takes her gabapentin and Wellbutrin.  Tr. 62.  She sits there for a few minutes then walks into the kitchen and makes a cup of coffee using the microwave.  Tr. 63.  She goes back to her room, sits on the bed, and turns on the television.  Tr. 63.  She then lies down on her side because she cannot sit for very long.  Tr. 63.  Sometimes she tries to get up and put clothes on but sometimes she does not want to or does not feel like it.  Tr. 63.  She has not taken a bath or shower since July 2014, after she fell in the tub.  Tr. 63-64.  Instead, she takes "bird baths" by sitting on the toilet and reaching into the sink.  Tr. 63.  She can stand up long enough to brush her teeth but then has to

17

sit down on the toilet.  Tr. 63, 72.  Her brother got her a toilet lift seat, a raised seat with arm rests, to help her.  Tr. 66.  Her niece washes Moxley's hair at the kitchen sink using a retractable hose.  Tr. 72.  She has trouble putting on socks and shoes.  Tr. 72.

Moxley does not cook, but she can put a meal in the microwave.  Tr. 64.  Her niece comes home in the afternoon and will sometimes cook something for her.  Tr. 64-65.  Most of the time she does not eat.  Tr. 65.  Her niece cleans the house.  Tr. 65.  Moxley sometimes sprays the table and wipes it off.  Tr. 65.  She cannot wash dishes because she cannot stand that long.  Tr. 65.  She has no social activities or hobbies.  Tr. 66.  She used to walk a lot with dogs she had, roller skate, attend concerts, and go to a place to sculpt clay.  Tr. 73.  She can no longer do these things because she is unable to sit for long enough to watch a concert and she cannot use her hands to sculpt clay.  Tr. 73.  She uses Facebook, but the computer is in the basement and she cannot go down there because there are too many steps.  Tr. 66.  She will use her niece's laptop and has to tap the keyboard with the side of her fingers because her fingers are tight.  Tr. 66.

Moxley testified about her vaginal fistula.  Tr. 66.  She had five surgeries by four doctors that were unsuccessful and now has too much scar tissue and there is nothing more they can do.  Tr. 67.  When she was working she could move fast enough to avoid an accident, but now she cannot move quickly enough and she soils herself a lot.  Tr. 67.  She wears a pad every day.  Tr. 65.  When she soils herself, it takes her fifteen to twenty minutes in the bathroom to clean herself with a washcloth.  Tr. 85.  She also has sleep apnea and she has an upcoming appointment to get a CPAP machine.  Tr. 68.

Moxley started using a cane in 2011 because it was difficult for her to walk.  Tr. 68.  She could not walk 40 feet without starting to limp or her right leg giving out.  Tr. 68.  She now used the cane more often.  Tr. 68-69.  She does not do much, but she uses the cane when she goes to

her doctor appointments or to the grocery store.  Tr. 69.  When she goes to the grocery store she cannot get through the whole store and she has someone with her to gather her groceries.  Tr. 69. Initially, she used her ex-fiancé's cane, but was later prescribed one by pain management.  Tr. 69.  She stopped driving when she was living in Baltimore in 2012 and thereafter got around by using a taxi.  Tr. 75.  She was also prescribed a back brace and a stimulator to use on her thighs. Tr. 69.

Moxley testified that she had been five feet, six inches tall but now she is five feet, five inches tall.  Tr. 70.  In 2010 she weighed about 135 or 140 pounds but has gained quite a bit of weight since then.  Tr. 70.  She believed the prednisone she was taking contributed to her weight gain as well as a lack of activity.  Tr. 70.  She has no other side effects from any of her other medications, although she stated that her Wellbutrin is not helping her and is making her worse. Tr. 71.  She received back injections and participated in physical therapy but neither helped her. Tr. 91.

### 2. Vocational Expert's Testimony

Vocational Expert Mark Anderson ("VE") testified at the hearing.  Tr. 93-109.  The ALJ discussed with the VE Moxley's past work.  Tr. 93-99.  The ALJ asked the VE to determine whether a hypothetical individual of Moxley's age, education and work experience could perform the work she performed in the past if that person had the following characteristics: can perform light work, can sit, stand and/or walk about six hours out of an eight-hour workday, can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, can never climb ladders, ropes or scaffolds, and would require the use of a cane any time she stood, walked, or balanced.  Tr. 99.  The VE answered that such an individual could perform Moxley's past work as a data entry clerk, customer service clerk, appointment clerk, and, as the DOT describes it,

office manager and order clerk.  Tr. 99-100.  The individual could not perform past work as a security guard.  Tr. 100.  The ALJ asked the VE if there were other jobs that the hypothetical individual could perform and the VE answered that such an individual could perform the following light, unskilled jobs that are performed while sitting: mail clerk (195,000 national jobs, 9,500 Ohio jobs, 3,500 regional jobs); electronics worker (240,000 national jobs, 13,000 Ohio jobs, 4,000 regional jobs); and small products assembler (217,000 national jobs, 10,000 Ohio jobs, 3,500 regional jobs).  Tr. 100-101.

Next, the ALJ asked the VE if his answer would change if the individual had the following, additional limitations: can have occasional contact with the general public, occasional changes in the work setting, and no production pace requirements.  Tr. 102.  The VE answered that all past work would be eliminated because of the occasional contact with the general public limitation but that such an individual could still perform the three additional jobs identified— mail clerk, electronics worker, and small products assembler.  Tr. 102.

Moxley's attorney asked the VE whether, based on the testimony given by Moxley, the VE believes that Moxley could be placed in a job on a full-time basis.  Tr. 103.  The VE replied that he did not make careful notes during Moxley's testimony and, therefore, he did not want to answer that question.  Tr. 104.  Moxley's attorney asked the VE what his opinion was regarding off-task tolerance in jobs responsive to the first hypothetical, and the VE answered that his opinion is different for semi-skilled and skilled work.  Tr. 104.  He explained that a worker can be off-task for 8 to 12 minutes in semi-skilled and skilled work and still maintain a competitive production rate.  Tr. 104.  Moxley's attorney asked what his opinion was regarding attendance, and the VE answered that his answer is also different for semi-skilled and unskilled work.  Tr. 104.  In unskilled work, an employer generally will tolerate two absences, "tardies," or leaving

early per month and for semi-skilled and skilled work employers generally will tolerate three absences, "tardies," or leaving early per month.  Tr. 104-105.  Moxley's attorney asked the VE his opinion regarding a worker who would require an unscheduled, twenty-minute break in addition to her regular breaks and the VE replied that many employers would not allow that on a consistent basis.  Tr. 105.

Next, Moxley's attorney asked the VE whether, if a sit/stand option was added to the ALJ's first hypothetical, the VE's answer would change with respect to the jobs available for such an individual.  Tr. 107.  The VE stated that Moxley's past jobs would not be available but that the three additional jobs would be available.  Tr. 107-108.  Moxley's attorney asked the VE whether any of Moxley's past work provides for direct entry into any skilled work and the VE replied yes, explaining that some of Moxley's past work was skilled work, such as the office manager and customer service representative jobs.  Tr. 108.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her February 17, 2015, decision, the ALJ made the following findings:

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

1.      The claimant meets the insured status requirements of the Social Security
        Act through December 31, 2015.  Tr. 25.

2.      The claimant has not engaged in substantial gainful activity since July 21,
        2010, the alleged onset date.  Tr. 25.

3.      The claimant has the following severe impairments: polymyositis,
        degenerative disc disease of the lumbosacral spine (mild disc bulging
        without stenosis and L3-L4, disc degeneration and superior articular facet
        hypertrophy with bilateral recess stenosis), moderate obstructive
        ventilator defect, mild restrictive ventilator defect.  Tr. 25.

4.      The claimant does not have an impairment or combination of
        impairments that meets or medically equals the severity of one of the
        listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 26.

5.      The claimant has the residual functional capacity to perform [a] reduced
        range of light work with the following specific limitations (*see generally*
        20 CFR 404.1567(b) and 416.967(b)).  She can stand/walk for six hours
        of an eight-hour workday.  She can occasionally climb ramps/stairs,
        balance, stoop, kneel, crouch, and crawl.  She can never climb ladders,
        ropes, or scaffolds.  She would require the use of an assistive device/cane
        when standing, walking, or balancing.   Tr. 33.

6.      The claimant is capable of performing past relevant work as an office
        manager, order clerk, customer service, data entry clerk, and appointment
        clerk.  This work does not require the performance of work-related
        activities precluded by the claimant's residual functional capacity.  Tr.
        36.

7.      The claimant has not been under a disability, as defined in the Social
        Security Act, from July 21, 2010, through the date of this decision.  Tr.
        37.

### V. Parties' Arguments

Moxley objects to the ALJ's decision on seven grounds.  Although presented separately,

many of her arguments overlap.  In sum, Moxley argues that the ALJ erred when she found that

Moxley did not meet Listings 1.02 (Major Dysfunction of a joint(s) (due to any cause) and

14.05A or 14.05E (Polymyositis and dermatomyositis) and did not provide sufficient explanation

for those findings; and erred when she found that Moxley could ambulate effectively per

1.00B2b.  Doc. 13, pp. 20-26.  She also argues that the ALJ failed to consider her obesity, upper extremity limitations, IFI, and vaginal fistula, and that the ALJ's credibility assessment is not supported by substantial evidence.  Doc. 13, pp. 18-26.  In response, the Commissioner submits that substantial evidence supports the ALJ's decision on all issues.  Doc. 16, pp. 9-23.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ failed to consider Moxley's obesity and the ALJ did not sufficiently explain her credibility assessment.

**Obesity:** The ALJ made no mention of obesity in her decision, despite the fact that Moxley was diagnosed with obesity by at least two medical providers (Tr. 390, 837) and maintained her obesity throughout the time frame covered in the record (*see, e.g.*, Tr. 305 (200 pounds in July 2010); 400 (211 pounds in December 2011); 387 (214 pounds in July 2012); 614 (203 pounds in October 2013); 780 (216 pounds in August 2014)).  *See Miller v. Comm'r of Soc. Sec.*, 811 F. 3d 825, 835 (6th Cir. 2016) (an ALJ must consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation (citation omitted));

SSR 02-1p, 2002 WL 34686281, *3-4 (obesity will be considered at all stages of the sequential evaluation and is evidenced by a diagnosis of obesity or treatment notes from an examining physician listing the claimant's height, weight and appearance, and when it appears in the record in a consistent pattern).

The Commissioner argues that the ALJ considered Moxley's obesity when noting that Moxley had taken prednisone and complained of weight gain as a side effect and observed that Moxley took prednisone for a total of four months in two years.  Doc. 16, p. 19 (citing Tr. 29, 27).  The fact that the ALJ apparently recognized prednisone as causing Moxley's obesity does not address the effects of Moxley's obesity, which the ALJ had a duty to consider.[5]  *See Miller, 811 F. 3d at 835*.  The ALJ did not consider Moxley's obesity at any step in the sequential evaluation despite Moxley's diagnosis of obesity and treatment notes from providers documenting her consistent pattern of obesity.  The ALJ's failure to do so was error.

**Credibility:**  The ALJ found that Moxley's statements concerning the intensity, persistence and limiting effects of her symptoms to be "not entirely credible for the reasons explained in this decision."  Tr. 33.  No specific portion of the ALJ's decision is dedicated to explaining her credibility assessment.

Despite Moxley's consistent complaints of pain and reports of severely limited functional abilities, the ALJ found her capable of standing and walking six hours in a workday; occasionally climbing, balancing, stooping, kneeling, crouching and crawling; and able to perform past relevant work.  Tr. 33.  To make these findings, however, the ALJ must have found Moxley not just "not entirely credible," but having almost no credibility.  To recap: treatment

---

[5] Although Moxley reported, in October 2014 when she weighed 210 pounds, that she gained 75 pounds "over the past year" due primarily to taking prednisone (Tr. 739-740), the record shows she consistently weighed more than 200 pounds as far back as April 2009 (Tr. 314 (209 pounds)).

notes show Moxley consistently complaining, beginning in 2010, of pain and difficulty walking; she explained at the hearing that in 2011 she had difficulty walking to her mailbox a short distance away; treatment notes document her difficulty with public transportation and she received a prescription for paratransit; treatment notes show she reported difficulty brushing her teeth and hair and that she experienced falls; and she testified that she cannot take a bath or shower and washes herself while sitting on the toilet, that her niece washes her hair for her in the kitchen sink, she spends most of her day lying in bed, and she does not perform chores.  In other words, to find that Moxley could stand and walk six hours a day, the ALJ had to have completely discounted her complaints of pain and functional abilities.  But the ALJ did not completely discount Moxley's complaints—the ALJ stated that she was "not entirely credible" but failed to explain what, specifically, she found not credible about Moxley's complaints and reported functional limitations.

The few portions of the ALJ's decision that do reference Moxley's complaints of symptoms and functional limitations are not accurate.  For instance, the ALJ commented that Moxley testified that she has not taken a bath or shower since she fell in the shower in July 2014, but then appeared to discount that testimony, stating, "The evidence fails to establish that any treating or examining medical source have noted any issues with the claimant's personal hygiene."  Tr. 31.  The ALJ missed the point.  Moxley did not state that she did not wash herself; she explained that she gives herself "bird baths" while sitting on the toilet reaching into the sink. Thus, Moxley testified that she cannot physically shower or take a bath, but the ALJ failed to address that physical limitation issue and its effect on her ability to work.  It is difficult to understand how an individual who can only wash herself in the manner Moxley described would be able to stand and walk six hours a day and occasionally balance, stoop, kneel, crouch and

crawl.  If, as it appears, the ALJ actually found Moxley's testimony not credible at all, the ALJ should have said so and should have provided an accurate and reasonable explanation for that finding.

The ALJ also stated, "Based on longitudinal objective radiological and examination findings and the claimant's subtherapeutic treatment for the effects of her symptoms due to alleged side effects, the effects of the claimant's severe physical impairments have restricted her to a reduced range of light work . . ."  Tr. 34.  The ALJ did not explain what she meant by "subtherapeutic treatment" despite evidently attaching significance to it.  The only indication in the ALJ's decision regarding side effects is Moxley's complaints of weight gain, acne, dry mouth, and difficulty swallowing when she took prednisone.  Tr. 30.  To the extent the ALJ is referring to Moxley's cessation of prednisone as "subtherapeutic treatment," such a conclusion is inaccurate given that Moxley repeatedly stated that prednisone was not helping her symptoms.  Even more significant is the fact that Moxley received a corrected diagnosis of IBM which, unlike the polymyositis she had previously been diagnosed with, is not an autoimmune disorder and is therefore not treatable with prednisone. That Moxley stopped taking a medication causing side effects when that medication did nothing to alleviate her symptoms and was later found to be the incorrect treatment for those symptoms is not evidence of "subtheraputic treatment" such that it would negatively effect upon Moxley's credibility regarding her symptoms.

In sum, the ALJ provided little explanation for finding Moxley "not entirely credible" and the explanation the ALJ provided is either inaccurate or irrelevant.  The ALJ's RFC assessment reflects far fewer limitations than someone with Moxley's complaints would have, yet the decision provides no logical bridge between Moxley's complaints and the ALJ's RFC assessment.  *See Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D.Ohio 2011)("[T]his Court

cannot uphold an ALJ's decision, even if there 'is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result[,]'" quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)); *see also* SSR 96-7p, 1996 WL 374186, at *4 ("When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.").  Accordingly, the undersigned is unable to consider whether the ALJ's credibility assessment was supported by substantial evidence, warranting remand.

**B. Other issues raised on appeal**

As noted, Moxley has raised a number of issues on appeal, including the ALJ's assessment regarding whether she met or equaled Listings 1.02 (Major Dysfunction of a joint(s) (due to any cause) and 14.05 (Polymyositis and dermatomyositis) and her ability to ambulate effectively, 1.00B2b.  She also argues that the ALJ failed to consider her upper extremity limitations, IFI, and her vaginal fistula.  The undersigned does not address these additional arguments because, on remand, the ALJ will reassess Moxley's obesity and credibility and that assessment will impact the ALJ's determination of those additional issues.  *See Gresham v. Comm'r of Soc. Sec.*, 2014 WL 3749375, at *11 (N.D.Ohio July 30, 2014) (declining to address the plaintiff's remaining assertion of error because remand was required and, on remand, the ALJ's determination might impact her findings).

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.[6]


Dated: April 15, 2016

Kathleen B. Burke
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)

---

[6]  This recommendation should not be construed as a recommendation that, on remand, Moxley be found disabled or deemed credible.